In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-1392

BRIAN J. KELLEY, DENISE D. BOYD,
YVONNE S. EMOUS, and BETTIE M. HOUSELY,

*Plaintiffs-Appellants,*

*v.*

MED-1 SOLUTIONS, LLC, WILLIAM J. HUFF,
FRANCIS R. NIPER, COURTNEY GABER, and
RICHARD R. HUSTON,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:07-cv-1245-SEB-JMS—**Sarah Evans Barker**, *Judge.*

ARGUED NOVEMBER 4, 2008—DECIDED NOVEMBER 25, 2008

Before BAUER, FLAUM, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* Med-1 Solutions, LLC ("Med-1") is a debt-collector that filed lawsuits in Indiana state small claims court to collect hospital charges owed by debtors to its client, St. Vincent Carmel Hospital, Inc. ("St. Vincent"). Med-1 filed these suits in its own name. Med-1

demanded and received attorney fees in these proceedings. Debtors then sued in federal district court, contending that Med-1, its owner, and its in-house lawyers violated the Fair Debt Collection Practices Act ("FDCPA") when they demanded attorney fees in the small claims proceedings. The district court dismissed the case for lack of subject matter jurisdiction based on the *Rooker-Feldman* doctrine. For the reasons discussed below, we affirm.

## I.  Background

Bryan Kelley, Denise Boyd, Yvonne Emous, and Bettie Housely each received medical treatment at St. Vincent and signed an acknowledgment of financial responsibility to pay for that treatment. When they did not pay, St. Vincent hired Med-1 to collect the debts owed to it.

Med-1 is licensed as a debt collection agency in Indiana and specializes in collecting consumer debts owed to health care providers. William J. Huff is the sole owner of Med-1. In order to facilitate the collection of consumer debt, Med-1 employed three in-house attorneys: Francis R. Niper, Courtney Gaber, and Richard R. Huston.

In August 2006 and October 2006, Med-1 filed individual actions against the four debtors in Hamilton County, Indiana small claims court. The actions sought payment on the debts owed to St. Vincent. Even though Med-1 was given the right to collect the consumer debt for St. Vincent, the hospital always maintained ownership of that debt. Med-1 did not purchase consumer debt from St. Vincent. Yet, Med-1 filed the lawsuits solely in its name as plaintiff.

In each case, Med-1 filed the one-page small claims complaint form, and it attached additional documents as part of the complaint. The small claims complaint form did not include St. Vincent's name as a creditor. On the form, Med-1 described the claims sought as "unpaid medical bills," and it directed readers of the complaints to "see attached." In each case, the documents attached to the complaint form indicated that the debts were owed to St. Vincent.

One of the documents attached in each case was a financial consent form that the debtor had signed prior to receiving treatment. In addition to establishing debtor liability to St. Vincent, each financial consent form provided that the signatory was responsible for "reasonable attorney fees" if his or her hospital account was forwarded to a collection agency.

Through Gaber, Med-1 requested attorney fees in its small claims suits against the four debtors. As a result of its small claims actions, Med-1 obtained judgments in its favor against Kelley in the amount of $892.09, including $375.00 in attorney fees; against Boyd in the amount of $450.00, including an undisclosed amount in attorney fees; against Emous in the amount of $3,658.50, including $350.00 in attorney fees; and against Housely in the amount of $2,241.45, including $375.00 in attorney fees.

Debtors learned from deposition testimony given by Med-1 employees in an unrelated matter that Med-1 filed approximately 4,415 lawsuits against consumer-debtors from about October 2006 to October 2007. Med-1 did not own the debt in any of these cases, but it always filed the

lawsuits in its own name as plaintiff. Med-1 demanded attorney fees in virtually all of these cases. In testimony, Med-1 employees admitted that Med-1 had agreements with St. Vincent and other health care providers that it would be paid attorney fees and court costs incurred with respect to the debt collection. Med-1 also would receive a percentage of the amounts collected after deduction of attorney fees and court costs. Additionally, debtors learned, Med-1 attorneys Gaber, Niper, and Huston had internal agreements with Med-1 whereby they would keep a certain percentage of attorney fees they had obtained (usually 20% or 25%). The remainder (75% or 80%) would go to Med-1.

On September 27, 2007, Kelley, Boyd, Emous, and Housely (hereinafter referred to as "plaintiffs") filed suit against Med-1, Huff, Niper, Gaber, and Huston ("defendants") in federal district court on behalf of themselves and all others similarly situated. They alleged that Med-1's representations that it was entitled to attorney fees violated §§ 1692e-f of the FDCPA, which generally prohibit the use of false, deceptive, or unfair means in connection with the collection of a debt. Plaintiffs claimed that Med-1 did not have the right to recover attorney fees from the plaintiffs without an assignment of ownership rights or contractual rights of the debt obligation from the health care provider; that Med-1 and its employees made false and misleading statements as to their entitlement to recover attorney fees; and that they were harmed by Med-1's deceptive demands for attorney fees. Plaintiffs also made state law fraud and equity claims not at issue on appeal. They requested

damages in an amount no less than all the attorney fees awarded to defendants by the state court.

On December 14, 2007, defendants filed a motion to dismiss plaintiffs' complaint. On February 6, 2008, the U.S. District Court for the Southern District of Indiana dismissed plaintiffs' complaint for lack of subject matter jurisdiction. The district court applied the *Rooker-Feldman* doctrine in dismissing plaintiffs' federal FDCPA claims and their state law claims. Plaintiffs appeal the district court's dismissal of their FDCPA claims only.

## II. Analysis

The *Rooker-Feldman* doctrine derives its name from two Supreme Court decisions, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). It "precludes lower federal court jurisdiction over claims seeking review of state court judgments . . . no matter how erroneous or unconstitutional the state court judgment may be." *Brokaw v. Weaver*, 305 F.3d 660, 664 (7th Cir. 2002) (citing *Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990, 996 (7th Cir. 2000)). The doctrine applies not only to claims that were actually raised before the state court, but also to claims that are inextricably intertwined with state court determinations. *See Feldman*, 460 U.S. at 482 n.16. A state litigant seeking review of a state court judgment must follow the appellate process through the state court system and then directly to the United States Supreme Court. *See GASH Assocs. v. Village of Rosemont, Ill.*, 995 F.2d 726, 727 (7th Cir. 1993).

The Supreme Court recently revisited the doctrine in *Exxon Mobil Corp. v. Saudi Basic Industries*, 544 U.S. 280, 284 (2005). The doctrine previously had been applied expansively. *See Exxon Mobil*, 544 U.S. at 283 (describing how lower courts at times had interpreted the doctrine "to extend far beyond the contours of the *Rooker* and *Feldman* cases"). In *Exxon Mobil*, the Court explicitly limited the doctrine. The *Rooker-Feldman* doctrine now "is a narrow doctrine, 'confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (citing *Exxon Mobil*, 544 U.S. at 284). The doctrine will not prevent a losing litigant from presenting an independent claim to a district court. *Exxon Mobil*, 544 U.S. at 293.

In this case, plaintiffs argue that the *Rooker-Feldman* doctrine does not bar federal subject matter jurisdiction. They divide their argument into two parts. First, they argue that their federal claims are independent of the state court judgments because their lawsuit seeks only to remedy defendants' deceptive *representations* and *requests* related to attorney fees and not the fact that the state courts awarded attorney fees. Second, they argue that even if the federal claims are not independent of the state court judgments, *Rooker-Feldman* should not apply because they did not have reasonable opportunities to litigate their federal claims in state small claims court. Defendants combat these arguments. In addition, they argue that even if *Rooker-Feldman* does not apply, issue

and claim preclusion do apply to bar the district court from entering judgments in plaintiffs' favor.

We review de novo a district court's determination that it lacks subject matter jurisdiction based on the *Rooker-Feldman* doctrine. *Brokaw*, 305 F.3d at 664. A district court, in ruling upon an issue of subject matter jurisdiction, must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiffs. *Capitol Leasing Co. v. Fed. Deposit Ins. Corp.*, 999 F.2d 188, 191 (7th Cir. 1993).

### A. Does *Rooker-Feldman* not apply because plaintiffs' federal claims are independent and distinct of the state court judgment?

As mentioned, plaintiffs carefully craft their argument so that their lawsuit seeks only to remedy defendants' *representations* and *requests* related to attorney fees, and not the state court judgments granting those requests. They argue that the representations and requests were deceptive and in violation of the FDCPA. Thus, they claim, all violations of the FDCPA occurred prior to the entry of the state court judgment and are independent of the state court judgment.

In attempting this argument, plaintiffs cite our decision in *Long v. Shorebank Development Corp.*, 182 F.3d 548 (7th Cir. 1999). Sasha Long was a tenant of subsidized housing who received a notice indicating that she was behind in her rent. When she contacted the lessor, Shorebank, its employees assured her that she did not

owe any rent. Shorebank nevertheless served an eviction complaint upon the plaintiff. Long represented herself pro se. She was asked by counsel for Shorebank to sign a pleading that counsel represented would extend the eviction deadline for two weeks. Unknown to the plaintiff, what she signed was actually a consent to entry of final judgment in favor of Shorebank on the eviction complaint. Although plaintiff actually owed Shorebank nothing, the eviction proceeded and she lost all of her personal property, her job, and custody of her daughter as a result. *Long*, 182 F.3d at 552-53.

Long sued in federal district court. She alleged four counts in her complaint. She contended that Shorebank and its counsel violated three provisions of the FDCPA and that they deprived her of property without due process of law in violation of 42 U.S.C. § 1983. In *Long*, we reasoned that *Rooker-Feldman* did not bar Long's three FDCPA claims from proceeding in district court. We wrote:

> The propriety of the Circuit Court judgment is not directly at issue with respect to the violations of the FDCPA Long asserts. For example, Count I of Long's complaint states that the defendants' conduct violated 15 U.S.C. § 1692e, in part, because the defendants falsely represented the character, amount, and legal status of the debt Long allegedly owed Shorebank by presenting Long with a notice and serving her with a complaint stating she owed Shorebank money—a fact they knew to be untrue . . . . The violation of the FDCPA alleged by Long in Count I (as well as the violations of § 1692f and § 1692g alleged in Counts II

and III) was independent of and complete prior to the entry of the eviction order. It makes no difference that Long may also deny the correctness of the eviction order in pursuing these claims.

*Id.* at 556. We went on to hold that Long's due process argument, the fourth count that she alleged, could not be separated from the eviction order entered against her. "[I]f the proceedings in the Circuit Court resulted in her favor," we wrote, "it seems unlikely that she would have been . . . deprived of her property as she complains." *Id.*

In this case, plaintiffs Kelley, Boyd, Emous, and Housely contend that their FDCPA claims are analogous to the FDCPA claims in *Long*. They argue that, like Long, they allege false and misleading statements by defendants in the collection of consumer accounts.

Yet, despite plaintiffs' best efforts to allege prior, independent injuries by drawing analogies to *Long*, the facts of this case are distinguishable. In her FDCPA counts, Long claimed that Shorebank misled her about the existence of a debt in the form of unpaid rent prior to and independent of the state court judgment. Shorebank sought to extract money from Long—in the form of unpaid rent—that she actually did not owe. Shorebank could have succeeded in its fraudulent debt collection attempt without going through the state court and obtaining a court judgment in its favor. Therein lies the distinction. In this case, plaintiffs charge that defendants fraudulently represented that they were entitled to attorney fees. Under Indiana law, a prevailing party only can obtain attorney fees if such fees are awarded by a court,

even when there is a written agreement between the parties providing for such fees. *See Morgan County v. Ferguson*, 712 N.E.2d 1038, 1043 (Ind. Ct. App. 1999). In other words, the defendants needed to convince the state courts that they were entitled to attorney fees in order to succeed in extracting money from plaintiffs.

Because defendants needed to prevail in state court in order to capitalize on the alleged fraud, the FDCPA claims that plaintiffs bring ultimately require us to evaluate the state court judgments. We could not determine that defendants' representations and requests related to attorney fees violated the law without determining that the state court erred by issuing judgments granting the attorney fees. Even in light of the Supreme Court's narrowing of *Rooker-Feldman* in *Exxon Mobil*, we conclude we are still barred from evaluating claims, such as this one, where all of the allegedly improper relief was granted by state courts. Despite plaintiffs' contentions to the contrary, this holding actually is consistent with our holding in *Long*, where we held that *Rooker-Feldman* barred Long's due process claims because, absent the eviction order, Long would not have suffered the loss of property for which she sought compensation. *Long*, 182 F.3d at 556; *see also Bullock v. Credit Bureau of Greater Indianapolis, Inc.*, 272 F. Supp. 2d 780, 783 (S.D. Ind. 2003) (plaintiffs alleging that defendants improperly sought treble damages could not "avoid *Rooker-Feldman* by framing their claims in terms of defendants' attempts to obtain exactly what the state court awarded to them"). Plaintiffs here cannot prevail on their argument that their claims are independent of the state court judgment. They

are the types of plaintiffs that *Exxon Mobil* anticipates and guards against: state court losers, who, in effect, are challenging state court judgments.

**B.  Does *Rooker-Feldman* not apply because plaintiffs did not have reasonable opportunities to litigate their claims in state small claims court?**

We proceed to plaintiffs' second argument, which is based on the "reasonable opportunity" exception to the *Rooker-Feldman* doctrine. The "reasonable opportunity" exception was first recognized by the Eleventh Circuit in 1983, *see Wood v. Orange County*, 715 F.2d 1543, 1547 (11th Cir. 1983), and we adopted it in 1986. *See Lynk v. LaPorte Superior Court No. 2*, 789 F.2d 554, 564-65 (7th Cir. 1986). Under the exception, if a plaintiff lacked a reasonable opportunity to litigate its claims in state court, then the federal lawsuit can proceed.

In advancing their argument based on the "reasonable opportunity exception," plaintiffs again rely on the *Long* case. After we explained that Long's three FDCPA counts were independent of the state court judgment, but that Long's due process argument could not be considered separate from the eviction order against her, we held:

> Notwithstanding these determinations regarding Long's § 1983 claim (and even her FDCPA claims for that matter), we conclude that one critical distinction between cases in which we have found *Rooker-Feldman* to be applicable and the present case exists rendering *Rooker-Feldman* inapplicable to the claims

contained in Long's complaint. In the proceedings before the state court that ultimately culminated in her eviction, Long was effectively precluded from raising the claims she presented in her suit before the district court. . . . [A]n issue cannot be inextricably intertwined with a state court judgment if the plaintiff did not have a reasonable opportunity to raise the issue in state court proceedings. Absent such an opportunity, it is impossible to conclude that the issue was inextricably intertwined with the state court judgment.

*Long*, 182 F.3d at 557-58.

Like in *Long*, plaintiffs argue that state court rules and procedures prevented them from having a "reasonable opportunity" to raise their FDCPA claims. They argue that the Indiana small claims procedures do not provide a reasonable opportunity to litigate FDCPA claims. Specifically, they argue in their reply brief: "The Plaintiffs' FDCPA claims were not mandatory Counterclaims that had to be filed in the Small Claims courts. . . . Small Claims' jurisdictional limitation of $6,000 is not adequate to support an FDCPA claim, let alone a class action proceeding. Small Claims judges simply do not have the experience or court structure to handle FDCPA class action litigation."

While we recognize that small claims court was not the preferred forum for plaintiffs to raise their specific federal claims, they were not precluded from raising their claims in state court. In *Beth-El All Nations Church v. City of Chicago*, 486 F.3d 286 (7th Cir. 2007)—which in-

volved a challenge to tax deed judgments for a former church property—we held that while plaintiffs were not able to bring in state court the specific claim that they later brought in federal district court, the reasonable opportunity exception did not apply because they had at their disposal an alternative method for attacking tax deed judgments under Illinois state law. *Beth-El*, 486 F.3d at 292-93. We find no reason to limit that reasoning to reasonable opportunities in the particular state court where the case is initially filed. In the instant case, Indiana Small Claims Rule 2(B)(10) permitted Kelley, Boyd, Emous, and Housely to transfer the small claims cases to the plenary docket for trial by jury. The right to jury trial is guaranteed by the state constitution and applies to small claims actions. *Lickliter v. Rust Feed & Seed & Lumber Co.*, 421 N.E.2d 10, 11 (Ind. Ct. App. 1981) (noting that small claims litigant's right to jury trial is guaranteed by the state constitution). Once their cases were on the plenary docket, plaintiffs would have had opportunities to raise their FDCPA claims in state court. We note that Fourth Circuit jurisprudence supports the proposition that the "reasonable opportunity" exception inquires whether the plaintiff had *any* reasonable opportunity to raise his or her claims, including transferring or appealing the case to a state court that can evaluate the claims. *See, e.g.*, *Brown & Root, Inc. v. Breckenridge*, 211 F.3d 194, 201-02 (4th Cir. 2000). Because of plaintiffs' opportunities to raise their FDCPA claims in state court upon transfer of their cases to the plenary docket, we conclude that plaintiffs in this case had reasonable opportunities to raise their claims in state court.

Moreover, irrespective of plaintiffs' opportunities in this case, it is difficult to envision a scenario in which a litigant who is otherwise barred by *Rooker-Feldman* from establishing subject matter jurisdiction in federal court could proceed with his or her lawsuit because he or she lacked an opportunity to present claims in state court. We note that the Tenth Circuit explicitly rejected the "reasonable opportunity" exception prior to *Exxon Mobil*, *see Kenmen Eng'g v. City of Union*, 314 F.3d 468, 478-80 (10th Cir. 2002), and the Sixth Circuit eliminated this exception as a result of *Exxon Mobil*. *See Abbott v. Michigan*, 474 F.3d 324, 330 (6th Cir. 2007). By dramatically narrowing the *Rooker-Feldman* doctrine in *Exxon Mobil*, the Supreme Court ensured that litigants always will have subject matter jurisdiction to bring claims that are independent of the state court judgment in federal district court. Hence, there is no need for a "reasonable opportunity" exception in those types of cases. On the other hand, the Supreme Court definitively concluded in *Exxon Mobil* that lower federal courts do not have subject matter jurisdiction in cases in which the plaintiff complains of an injury that cannot be separated from the state court judgment. In those cases, regardless of the opportunity that he or she had to raise a claim in state court, the litigant must appeal through the state court system and then seek review in the United States Supreme Court by filing a writ of certiorari. The "reasonable opportunity" exception was developed during a time when federal courts applied *Rooker-Feldman* much more expansively. Post-*Exxon Mobil*, the "reasonable opportunity" exception to the *Rooker-Feldman* doctrine is of questionable viability.

### III. Conclusion

We AFFIRM the district court's holding because the *Rooker-Feldman* doctrine applies and there is no federal subject matter jurisdiction in this case. Therefore, we need not address defendants' arguments related to res judicata and collateral estoppel.